UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Crim. No. 18-cr-10383-DPW |
| v. | ) |
| | ) |
| PAUL CESAN, | ) |
| Defendant. | ) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through the undersigned Assistant U.S. Attorneys, requests that on June 17, 2019 the Court sentence defendant, Paul Cesan (hereinafter, "defendant" or "Cesan"), to a six month term of imprisonment, a one year term of supervised release, a fine within the Guideline sentencing range calculated by the parties in their plea agreement (unless the Court finds that the Defendant is not able to pay a fine) and that the Court order the payment of restitution to the MSP.

**Facts**

**A. Introduction**

In early 2017, the Massachusetts State Police ("MSP") began an internal investigation of several overtime programs within what was then known as Troop E.[1] Troop E was primarily responsible for enforcing criminal law and traffic regulations on Interstate-90, the Massachusetts Turnpike ("I-90"), which spans the Massachusetts/New York border to the Boston Harbor. Troop

---

[1] Troop E has since been disbanded and its members and responsibilities absorbed into other MSP troops.

E was comprised of approximately one hundred and fifty troopers, assigned to five barracks: Westfield, Charlton, Weston, Tunnels, and Headquarters.[2]

In early 2018, MSP announced that an internal audit had revealed that a number of former Troopers were suspected of failing to work some or all of the overtime shifts for which they had been paid. Soon after, the United States Department of Transportation and FBI began an investigation of the suspected overtime abuse within Troop E.

As a result of that investigation, seven former Troopers (including this defendant) and one former lieutenant were charged with embezzling funds from an agency receiving federal funding, in violation of 18 U.S.C. §666.

As of this date, all eight have pleaded guilty to the charges.[3] *See* Pre-Sentence Report ("PSR"), ¶6.

---

[2] Both the Tunnels and Headquarters Barracks were located in Boston.

[3] Former Trooper Eric Chin has been sentenced to one day of incarceration, followed by a one year term of supervised release, former Trooper Gregory Raftery was sentenced to three months' incarceration followed by a one year term of supervised release, former Trooper Kevin Sweeney was sentenced to 60 days incarceration, followed by a one year term of supervised release, former Trooper Heath McAuliffe was sentenced to one day of imprisonment, followed by a one year term of supervised release, and, former Lieutenant David Wilson was sentenced to one day of imprisonment, followed by a two year term of supervised release. *See United States v. Chin*, 18-cr-10384-RGS; *United States v. Raftery*, 18-cr-10203-WGY; *United States v. Sweeney*, 18-cr-10286-NMG; *United States v. McAuliffe*, 19-cr-10056-DLC; and *United States v. Wilson*, 18-cr-10290-RGS. Former Trooper Gary Herman is scheduled to be sentenced on June 20, 2019. *See United States v. Gary Herman*, 18-10326-RWZ. The sentencing of former Trooper Daren DeJong was commenced on May 2, 2019, but has been continued without a new date being set. *See United States v. Daren DeJong*, 18-cr-10307-MLW.

### B. The Abuse of Troop E Overtime Programs

In addition to salary for a regular 8-hour work shift, Troopers within Troop E were also able to earn hourly overtime pay equivalent to 1.5 times their regular hourly pay rate for various overtime assignments. Depending upon seniority, Troopers were paid between approximately $60-75 per hour, while Lieutenants could make $100 per hour, or more.

One of these overtime programs was the "AIRE" (Accident and Injury Reduction Effort) program. The objective of the AIRE program was to reduce accidents, crashes, and injuries on I-90 through an enhanced presence of MSP Troopers who targeted vehicles traveling at excessive speeds and exhibiting aggressive driving behaviors.

These AIRE shifts were 4-hours long and organized by letter according to a specific shift: A-AIRE from 7:30 a.m. to 11:30 a.m.; B-AIRE from 11:00 a.m. to 3:00 p.m.; C-AIRE from 3:30 p.m. to 7:30 p.m.; and D-AIRE from 7:00 p.m. to 11:00 p.m. Each shift was ordinarily comprised of one Officer in Charge ("OIC") and from two, up to five, troopers. The OIC was responsible for insuring that the shifts were conducted according to MSP policy and procedures.

The A, B, and C AIRES were conducted across the entire Turnpike. Thus, for A, B, and C AIRES, Troopers from the far-western section of the state could find themselves under the supervision of an OIC in Boston, or vice versa. The D-AIRES, in contrast, were conducted exclusively in the Boston tunnels and surrounding areas.

Another overtime program was the "X-Team" program. X-Team overtime shifts focused on aggressive driving and were eight hours long, coinciding with existing MSP work shifts, *i.e.*, 7:00 a.m. to 3:30 p.m. (day); 3:00 p.m. to 11:30 p.m. (evening); and 11:00 p.m. to 7:30 a.m. (night).

Troopers were expected to issue a minimum of eight to ten citations for each AIRE shift and twelve to fifteen citations for each X-Team shift. Any failure to issue the required number of citations drew negative scrutiny from supervisors and command staff.

Investigation has revealed that the subjects of this investigation performing AIRE and X-Team overtime routinely and regularly did not work the full four, or eight, hours required. Troopers assigned to these shifts who chose to abuse these overtime benefit would purport to write the minimum number of tickets, and then simply go home. In many instances, these Troopers would obtain the minimum number of citations in an hour, or less.

In other circumstances, such as inclement weather, these Troopers would forgo writing any citations at all. In the event of such weather, policy required Troopers working these overtime shifts to continue to work, *i.e.*, "re-deploy," as directed by superiors. In practice, inclement weather meant neither tickets, nor work, was required for Troopers who chose to fraudulently abuse the AIRE program. Reminiscent of a grade school "snow day," Troopers abusing the program treated AIRE overtime as if it were a paid holiday.

## **Advisory Sentencing Guidelines**

**A.     Plea Agreement**

The parties' positions with respect to the Sentencing Guidelines, which are set forth in pages 2-3 of the Plea Agreement, are:

(i)     in accordance with USSG §§ 2B1.1(a)(2), defendant's base offense level is 6, because the offense of conviction has a statutory maximum term of imprisonment that is less than 20 years;

(ii)    in accordance with USSG §§ 2B1.1(b)(1)(C), defendant's offense level is increased by four levels because the offense involved a loss in excess of $15,000 but less than $40,000;

(iii) in accordance with USSG §§ 2B1.1(b)(10), defendant's offense level is increased by two levels because the offense involved sophisticated means;

(iv) in accordance with USSG §§ 3B1.3, defendant's offense level is increased by two levels because the offense involved the abuse of a position of trust;

(v) in accordance with USSG §3E1.1, the U.S. Attorney agrees to recommend that the Court reduce by two levels defendant's adjusted offense level because of defendant's prompt acceptance of personal responsibility for the offense conviction in this case.

Accordingly, the parties have calculated the total offense level to be 12. Mr. Cesan's criminal history category is I, which results in a GSR of 10-16 months' imprisonment. *See* Plea Agreement, p. 2-3.

**B.    The Pre-Sentence Report**

Probation's analysis mirrors that of the parties, except that Probation has determined that the loss in this matter should be calculated to be $53,099.50.[4] *See* PSR, ¶28.

The inclusion of 2015 loss leads to a further increase of two points to the Guideline calculation, due to a six (rather than four) point increase under USSG §2B1.1(b)(1)(D), for a loss greater than $40,000, but less than $95,000. *See* PSR, ¶34.

---

[4]    The United States has reviewed calendar year 2015 materials that it had obtained for the purpose of potentially bringing a superseding indictment against Cesan. Using those materials, and the same methodology as was utilized to calculate the 2016 loss, the government estimates that Cesan was not present, and not working, for 85.25 hours of AIRE overtime and 232.25 hours of X-Team overtime during 2015. At a rate of approximately $75 per hour, the loss to the MSP for 2015 was $23,812.50.

5

Probation has determined the total offense level to be 13.[5] *See* PSR, ¶42. That offense level, with criminal history category I, results in a GSR of 12 to 18 months' imprisonment.[6] *See* PSR, ¶88.

## Cesan's Offense Conduct

Cesan was a Massachusetts State Trooper for approximately twenty-five years until his retirement in March of 2018. In 2016, Cesan collected over $29,000 for AIRE and X-Team overtime shifts and hours that he did not work. To accomplish this fraud, Cesan falsified citations, overtime paperwork, and MSP payroll submissions. This conduct included both occasions where he submitted false and bogus citations to be paid for work he did not do and also days for which he was paid for overtime hours without submitting any citations at all.

Cesan's conduct on September 5, 2016, is exemplary of an instance where Cesan used bogus citations to be paid for hours he did not work. On that day, payroll records reflect that Cesan worked his regular shift from 11:00 p.m. on September 4th, through 7:30 a.m. on the morning of September 5th. Cesan then worked a B-AIRE overtime shift from 11:00 a.m. to 3:00 p.m.

To be paid for the B-AIRE overtime shift, Cesan submitted an AIRE Activity Card in which he claimed: (1) to have worked the "B" AIRE overtime shift (11:00 a.m. to 3:00 p.m.); (2) to have written 7 motor vehicle citations; and (3) to have done this work in Cruiser 56E. Cesan also submitted copies of the seven citations he claimed to have written as further evidence he had

---

[5] Because the offense level reaches sixteen, Cesan would be eligible to receive an additional one point deduction for acceptance of responsibility. *See* USSG §3E1.1(b); PSR ¶41A.

[6] The government objects to the PSR's offense level calculation because it is bound by the plea agreement to calculate the guidelines in accordance with section 3 of the plea agreement (at page 2) as set forth above.

6

worked those hours. The citations purported to have been written between 11:05 a.m. and 1:10 p.m.[7]

According to RMV records, none of the citations Cesan claimed to have written that day were issued to real drivers. Cesan did not run a single driver history that day. And, Cesan's cruiser's radio data showed that his radio did not turn on at all during that overtime shift. Thus, the entire time that Cesan claimed to be working an AIRE shift, his cruiser radio was off – signifying that he was not driving or operating his cruiser.

By way of further example, on October 15, 2016, Cesan was paid for an eight hour overtime shift without submitting any citations at all. On that date, payroll records reflect that Cesan worked his regular shift from 11:00 p.m. on October 14, 2016, through 7:00 a.m. on the morning of October 15th. Cesan then took one half hour of leave (his regular shift would have otherwise finished at 7:30 a.m.) which allowed him to work an eight hour "X-Team" shift from 7:00 a.m. to 3:00 p.m.

Cesan did not write a single citation or run a single driver history during the shift. Cesan's cruiser radio data showed that on October 14, 2016, Cesan's cruiser came on at 10:40 p.m., consistent with the beginning of his regular shift, and turned off at 6:48 a.m. on October 15, 2016, consistent with the end of his regular shift. The radio was not turned on again until 10:54 p.m. on October 16, 2016. Thus, the entire time that Cesan claimed to be working an X-Team shift on

---

[7] The First Circuit has held that the sophisticated means enhancement is appropriately applied in cases involving numerous, even repetitive, steps, regardless of whether each step was itself sophisticated. *United States v. Foley*, 783 F.3d 7, 25 (1st Cir. 2015) (and cases cited). The many steps involved in this scheme, some or all of which were undertaken for each fraudulent overtime shift throughout the year, "make [Cesan's] scheme more effective and difficult to thwart, and it is enough to justify the enhancement." *Foley*, 783 F.3d at 25 (quotation omitted).

7

October 15, 2016, Cesan's cruiser radio was off – signifying that he was not driving or operating his cruiser.

Investigators found a similar pattern of fraud throughout Cesan's MSP records for 2016 (*i.e.*, cruiser radio data, CJIS data, MSP paperwork, etc.). Investigators have determined that during that period, Cesan was not present for approximately 78.25 hours of AIRE overtime and 312.25 hours of X-team overtime.[8] At a rate of approximately $75 per hour, the MSP paid Cesan $29,287 for overtime hours that were not worked in 2016.

## **Argument**

Few crimes strike at the core of the justice system more than those involving law enforcement officers who choose to break, rather than uphold, the law. Though at its heart a crime motivated by simple greed, it is far more troubling than the run of the mill fraud cases in this court. This crime, and the abusive culture it served to perpetuate, reflect a betrayal of the trust and power granted to those who serve in law enforcement.

The factors set forth in 18 U.S.C. §3553(a), including: the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the conduct; dictate a sentence of six months incarceration, a one year term of supervised release, a fine within the Guideline sentencing range calculated by the parties in their plea agreement (unless the Court finds that the Defendant is not able to pay a fine) and the payment of restitution to the MSP.

---

[8] In or around 2016, Cesan's annual MSP compensation was approximately $163,533, which included approximately $50,866 in overtime pay.

Respectfully submitted,

                                ANDREW E. LELLING
                                United States Attorney

                        By:     */s/ Mark Grady*
                                MARK GRADY
                                DUSTIN CHAO
                                Assistant U.S. Attorneys

## **CERTIFICATE OF SERVICE**

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).
                                */s/ Mark Grady*
                                MARK GRADY
                                DUSTIN CHAO
                                Assistant U.S. Attorneys

Date:   June 11, 2019